FILED
2015 Mar-19  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **WIL A. VICKERY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:   7:12-CV-3926-RDP** |
| | } | |
| **REMINGTON ARMS COMPANY** | } | |
| **LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on (1) Defendant's Motion to Exclude Plaintiff's Liability Expert (Doc. # 30); (2) Defendant's Motion for Summary Judgment (Doc. # 31); and Defendant's Motion to Strike the New Affidavit of Plaintiff's Expert (Doc. # 45).   The Motions have been fully briefed.   (Docs. # 35, 37, 43, 46, 47).

Plaintiff's Amended Complaint asserts three claims: (1) a violation of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), (2) negligence/wantonness, and (3) breach of warranty.   (Doc. # 15).   The Motions before the court (Docs. # 30, 31 and 45) are interdependent because a ruling excluding Plaintiff's expert's opinions would deprive Plaintiff of evidence of causation, an essential element of each of his claims.   *See Tillman v. R.J. Reynolds Tobacco Co.,* 871 So.2d 28, 31 (Ala. 2003) (To succeed on a claim under the AEMLD, the plaintiff must prove, among other elements, "that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer." (citation and internal quotation marks omitted); *Farr Metal, Inc. v. Hines*, 738 So.2d 863, 863 (Ala. 1999) (Under Alabama law, to prevail on a negligence claim, "a plaintiff must

establish four elements: 1) a duty to a foreseeable plaintiff; 2) a breach of that duty; 3) proximate

causation; and 4) damage or injury); *Clark v. Allied Healthcare Products, Inc.*, 601 So.2d 902, 903

(Ala. 1992) ("In order to sustain a cause of action under breach of warranty, plaintiff must prove

the existence of such warranty, breach, and proximate causation of damages.").

## I.      Background

Plaintiff's theory in this case is that he was injured while firing a rifle because of

Defendant's defective ammunition.   More specifically, Plaintiff claims that the Core-Lokt .270

caliber 130 grain PSP cartridge (which was manufactured by Defendant and fired by Plaintiff) was

over-pressurized and caused the rifle and cartridge to be blown apart injuring Plaintiff.   Plaintiff

has proffered the expert testimony of Lawden H. Yates in support of his theory.   The Motions

filed by Defendant (Docs. # 30, 31 and 45) challenge the admissibility of the expert opinion

offered by Yates.   Based upon the issues raised in connection with the Motions before the court, it

is necessary for the court to examine the record evidence about the rifle and ammunition at issue in

this case.

Before the incident upon which Plaintiff bases his claim, he had owned his Browning

A-Bolt II rifle for approximately two years.   (Doc. # 30-6 at 95:23-96:9, 97:19-23, 98:5-8).

Plaintiff was an experienced hunter.   (Doc. # 30-6 at 21:21-23:20, 43:13-44:9).   He cleaned the

gun every week or two, and had cleaned it the night before the incident causing his injury.   (Doc.

# 30-6 at 97:19-23, 100:9-12, 103:6-16).   Plaintiff had not experienced any trouble with the bolt,

getting the bolt to close, or the way the bolt worked.   (Doc. # 30-6 at 107:7-15).   He did not

notice anything unusual about the gun when loading it on the morning of the incident.   (Doc. #

30-6 at 115:23-116:4).

On January 19, 2011, Plaintiff was hunting from a deer stand near his brother's home. (Doc. # 15 at ¶ 8; Doc. # 30-6 at 109:2-110:4).   Plaintiff was using the Browning A-Bolt II rifle with Remington Core-Lokt 130 grain PSP ammunition.   (Doc. # 15 at ¶ 9).   The ammunition came in a box of 20 cartridges.   (Doc. # 30-6 at 57:5-58:2).   That day, Plaintiff had fired 16 of the 20 cartridges without experiencing anything out of the ordinary.   (Doc. # 30-6 at 57:14-58:2).

On the morning of the hunt, Plaintiff fired shots at two deer and a bobcat, missing all three. (Doc. # 30-6 at 115:1-17).   Plaintiff thought that his scope was out of alignment. (Doc. # 30-6 at 116:5-22).   Plaintiff left his deer stand to (among other things) purchase more ammunition. (Doc. # 30-6 at 124:1-125:6).

After buying ammunition, Plaintiff went to another location near his brother's house to sight his rifle.   (Doc. # 30-6 at 130:2-131:1).   Plaintiff set up a target at 100 yards.   (Doc. # 30-6 at 130:2-131:1, 138:17-22).   He loaded the rifle and closed and lowered the bolt-handle.   As the following testimony indicates, although Plaintiff lowered the bolt-handle, he could only assume that the locking-lugs on the rifle's bolt-head were locked in the receiver:

> Q.   When you closed the bolt on that day, you can't see the locking lugs at the end of the bolt, right?
>
> A.   You cannot.
>
> Q.   So when you move the handle down, you don't know whether or not the locking lugs on this particular day locked up properly, correct?
>
> A.   Correct.

(Doc. # 30-6 at 147:18-148:4).

Plaintiff acknowledged that the rifle would not be functioning properly if the locking-lugs did not lock when he closed and lowered the bolt-handle:

3

Q.   If you were to close the bolt handle on a bolt action rifle, but the locking lugs between the bolt and the rest of the gun did not properly engage, would you consider that a malfunction with the gun?

A. Yes.

(Doc. # 30-6 at 96:10-96:17).

When Plaintiff pulled the trigger to shoot the target, the chambered round fired, and the Plaintiff immediately felt a blast hit him in the face.   (Doc. # 30-6 at 148:5-150:5).   The bolt had been ejected rearward from the rifle.   (Doc. # 30-6 at 150:18-151:13).   Plaintiff sustained a broken nose and a broken right thumb.   (Doc. # 30-6 at 155:22-156:2; 170:5-171:3; 182:16-183:2; 185:22-186:14).

## A.    The Rifle

Browning manufactured the subject rifle -- a Browning A Bolt II -- in 1994.   (Doc. # 30-3 at 3).   Plaintiff bought the rifle, used, from his father's uncle, approximately two years prior to the 2011 accident.   (Doc. # 30-6 at 95:23-96:9; 98:5-8).   The Browning rifle utilizes a bolt-action style lockup designed to contain the pressures produced in the barrel when a chambered cartridge is fired.   (Doc. # 30-3 at 5).   The bolt assembly is designed to lock in the firing position when the user pushes the bolt-handle fully forward and then down.   (Doc. # 30-3 at 5).

When the bolt-handle is closed and lowered, the bolt-head is designed to rotate clockwise causing its three locking-lugs to align with lug mating surfaces or abutments in the receiver. When the bolt-handle is closed, if the bolt-head locking-lugs do not engage the mating surfaces in the receiver, the rifle is not locked; in that event, it is not safe to fire the chambered cartridge. (Doc. # 30-3 at 5-6).

4

By design, as the bolt-handle is closed and lowered, the linkage of the bolt-head to the bolt-handle through the bolt-body causes the bolt-head's locking-lugs to rotate into engagement with the mating receiver surfaces.   (Doc. # 30-3 at 5-6).    If the linkage between the bolt-handle and the bolt-head is broken or interrupted, the lowering of the bolt-handle will not lock the bolt-head locking-lugs.   (Doc. # 30-3 at 5, 8; Doc. # 30-2 at 148:10-149:20).

A bolt-action rifle must be in good working order and mechanically locked during firing to properly support and contain the pressures generated by the firing of a cartridge. (Doc. # 30-4 at 9-10).   If the rifle is fired without engagement of the bolt-head's locking-lugs in the receiver, the rifle cannot contain the rearward thrust forces generated by the standard pressure of a fired cartridge. (Doc. # 30-4 at 9-10).   Such a condition in the rifle is dangerous and can cause rearward ejection of the bolt upon firing of a standard pressure cartridge. (Doc. # 30-2 at 192:8-192:14, 218:17-219:1; 219:19-220:7; 246:13-247:1).

When a rifle is fired while unlocked and the bolt is forcibly propelled rearward, the head of the cartridge is held to the bolt-head by the extractor and pulled rearward with the bolt.   However, the body of the cartridge obturates (*i.e.*, expands) to the dimensional limits of the rifle's chamber. (Doc. # 30-4 at 6, 10).   As a result, as the bolt is propelled rearward, the cartridge case head will be torn or pulled from the case body, creating a 360° case head separation.   (Doc. # 30-4 at 10). As the cartridge separates and the bolt is ejected rearward, the gas pressure created by the burning gunpowder, which normally exits only the muzzle of the rifle, is also released to the rear. (Doc. # 30-4 at 10).

When examined by the parties' experts, the linkage between the rifle's bolt-handle and the bolt-head was severed between the bolt-handle and the bolt-body:

Q.      So as you found the evidence, there's actually a separation between the two parts that are necessary to be together for the bolt handle and the lugs to rotate in unison; correct?

A.      Correct.

(Doc. # 30-2 at 256:2-256:15).

In order for the bolt to be ejected rearward when the rifle is fired when locked, the lugs and their receiver mating surfaces could "shear[] off."  ((Doc. # 30-2 at 129:13-21).   Here, they were not sheared off, but showed evidence of "contact marks," which could have been caused by either "use of the rifle over the years" or the "incident [at issue in this case] itself."  (Doc. # 36-1 at 47:14-24).

## B.      The Ammunition

Remington first introduced Core-Lokt .270 caliber 130 grain PSP ammunition in 1951. (Doc. # 30-4 at 5).   The industry standard for allowable .270 caliber cartridge chamber pressure on firing is 65,000 PSI (pounds per square inch).   (Doc. # 30-4 at 7).

In examining the remnants of the "Incident Cartridge," Plaintiff's proposed expert, Yates, found none of the common signs of high-pressure, such as (1) a pierced, leaking or blown primer, (2) a smeared case head with deformation of the characters on the case head, or (3) a localized rupture of the case head with brass wash or flow into the surrounding areas of the rifle. (Doc. # 30-2 at 273:20-277:23; 278:3-21; 279:13-283:20; 285:17-288:6; 314:2-17).   Further, on June 21, 2013, the parties jointly participated in CT scans of three remaining unfired Remington cartridges produced by the Plaintiff. (Doc. # 30-4 at 18-20).   Remington determined the three unspent cartridges did not have any manufacturing deficiencies. (Doc. # 30-4 at 18-20).   The geometry and volume of the powder in the three cartridges was proper and consistent.   (Doc. # 30-4 at 19).

Yates has not offered any opinion about the pressures which would be generated by the remaining unfired cartridges.   (Doc. # 30-1at p. 2).

A CT scan of the case-head lodged on the face of the bolt-head showed that the identifying letter characters were present and not deformed.   (Doc. # 30-4 at 18).   The primer of the cartridge was not pierced or blown.   (Doc. # 30-4 at 19; Doc. # 30-2 at 273:3-274:1; 279:13-280:15). Yates could not identify any high-pressure brass flow or wash from the cartridge.   (Doc. # 30-2. at 274:2-277:23, 314:2-17).   The Incident Cartridge experienced a 360° separation of the case head away from the case body—not a localized rupture which would be an indicator of high pressure. (Doc. # 30-4 at 8, 10, 14, 15, 23; Doc. # 30-3 at 18, 20; Doc. # 30-2 at 278:3-21).   Yates acknowledged he did not know why the Incident Cartridge experienced a 360° separation of the case head from the case body:

> Q.      In a fully locked-down scenario where the bolt is fully forward and the cartridge is fully seated forward in the chamber, do you have an expectation as to whether or not you would see a localized rupture of the case head or a 360-degree severance of the case head in a high-pressure scenario?
>
> A.      I wouldn't have any expectation of either.
>
> Q.      You just couldn't say one way or the other?
>
> A.      I don't think so.
>
> Q.      Well, would you agree with me that what we see here is 360 degrees of separation?
>
> A.      Yes.   It's all the way around the cartridge.   Why that happened, I don't know.

(Doc. # 30-2 at 278:3-21).

Yates admitted he was unfamiliar with the standard pressure specification for a .270 caliber cartridge. (Doc. # 30-2 at 130:8-23; 215:17-216:1).   Nor could Yates quantify the amount of

pressure he believed was generated by the Incident Cartridge at the time of the incident:

> Q. And you haven't done any calculations of the pressures involved which caused the Vickery rifle to explode in the manner in which we see it here today; is that right?
>
> A. Right.

(Doc. # 30-2 at 169:18-23, 216:2-13).    Notwithstanding his lack of calculations, Yates offered his opinion that the Incident Cartridge must have generated "extremely high pressure."   (Doc. # 30-2 at 321:8-13, 276:21-277:9).

Remington's experts conducted pressure-testing on exemplar Browning rifles.   (Docs. # 30-3 and 30-4).   The firing of a normal pressure cartridge in a rifle with a bolt-handle separated from the bolt-body (such that the bolt-handle and bolt-head would not rotate in unison—the condition the subject Browning rifle was found to be in) caused damage to the exemplar rifle which matched the damage found in Mr. Vickery's rifle.   Specifically, the exemplar rifle experienced (1) complete ejection of the bolt assembly rearward towards the shooter, (2) shearing of the receiver bolt-handle notch on the side of the rifle, (3) destruction of the rifle's stock, magazine and floor plate, and (4) a complete 360° separation of the cartridge case head from the cartridge case body.   (Doc. # 30-3 at 7-12, 19-20, 22; Doc. # 30-4 at 17).   Remington's testing also established that intentionally created high-pressure cartridges of 120,000 and 140,000 PSI did not cause a properly functioning Browning rifle to fail in a manner similar to Mr. Vickery's rifle; indeed, even under these pressures (which are more than double the standard allowable pressure for a .270 caliber cartridge), the locked bolt assembly was not ejected from the rifle.   (Doc. # 30-3 at 13-18, 20, 22).

Yates conducted no testing whatsoever.   (Doc. # 30-2 at 125:19-126:23).   That is, he has not tested to confirm the accuracy of any of the assumptions he has used to support his opinion.

## II.    Standards of Review

### A.    *Daubert* and Rule 702

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, and *Daubert* and its progeny.   Federal Rule of Evidence 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), the Supreme Court held that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable.   "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability."   *Dhillon v. Crown Controls Corporation*, 269 F.3d 865, 869 (7th Cir. 2001); *see also U.S. v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).   Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[1]

---

[1] Rule 702 was amended in 2011. According to the advisory committee notes (2011 Amendments) to Rule 702, "[t]he language of Rule 702 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility."

Accordingly, under Rule 702, "this [c]ourt has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." *Whatley v. Merit Distribution Services*, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted).

While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95; *see McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). "But conclusions and methodology are not entirely distinct from one another"; neither *Daubert* nor Federal Rule of Evidence 702 requires a trial judge "to admit opinion evidence that is connected to existing data only by the *ipse dixit*[2] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To aid in determining reliability under Rule 702, courts look to the non-exclusive factors set forth in *Daubert*:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 592-95); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) ("[*Daubert's*] list of factors was meant to be helpful, not definitive."). Under *Daubert*, "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Fed. R. Evid.

---

[2] From the Latin, this phrase is translated "he himself said it." An *ipse dixit* statement is one which is unsupported and rests solely on the authority of the individual who makes it. *See* http://thelawdictionary.org.

702 advisory committee's notes (2000 Amendments) (citations omitted). The notes to Rule 702 make clear that "[n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony." *Id.* The Rule "expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* But, "[a]s gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Chapman v. Procter & Gamble Distributing, LLC,* 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). An expert's failure to satisfy any of the four reliability factors recognized in *Daubert* is sufficient to preclude the testimony of a causation expert from testifying at trial. *Daubert*, 509 U.S. at 593–94.

**B.    Summary Judgment**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

11

(1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   A movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed.R.Civ.P. 56(c)(1)(B); see also Fed.R.Civ.P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").   Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.   *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson*, 477 U.S. at 248.   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations."

12

*Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).   As *Anderson v. Liberty Lobby, Inc*. teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial."   *Anderson*, 477 U.S. at 252. "Mere allegations" made by plaintiffs are insufficient.   *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp.2d 1257, 1262 (D.Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'"   *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc*., 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Discussion

The court's gatekeeping obligation requires that it evaluate a proposed expert's qualifications in light of what is necessary to explain a particular subject matter to the jury.

Whether a *Daubert* hearing is necessary is a decision committed to the trial court's sound discretion. *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). "As we have explained previously, *Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." *Id.* (internal quotes omitted).[3]

Plaintiff disclosed Yates as his sole liability expert. (Doc. # 30-1). Yates received a Bachelor of Science in Laboratory Technology with a Major in Chemistry from Auburn University in 1974. (Doc. # 36-2 at 2). He received a Juris Doctor from the Birmingham School of Law in 1982. (Doc. # 36-2 at 2). He received a State Peace Officer's Certificate from the Alabama Peace Officer's Standards and Training Commission after completing the Birmingham Police Academy. (Doc. # 36-2 at 2). He worked for the Alabama Department of Forensic Sciences for twenty-five (25) years, and has approximately forty (40) years of experience as a forensic scientist. (Doc. # 36-2 at 3). His experience is primarily in the discipline of Firearms Identification which is the field most often associated with the determination of whether a spent bullet or cartridge came from a particular firearm. (Doc. # 36-2 at 3). Forensic firearms examiners also have training to enable them to detect defects in firearms and ammunition. (Doc. # 36-2 at 3). He has completed armorer's courses which teach how to assemble and repair firearms. (Doc. # 36-2 at 4). He has participated in independent quality control testing, and has testified regarding the use and misuse of firearms in criminal and civil courts in Alabama, Georgia, Florida, Mississippi and South Carolina. (Doc. # 36-2 at 4). He stated in his affidavit that he has examined, tested, and compared firearms involved in incidents in which over- or under-pressured ammunition caused the firearm to explode and cause injury. (Doc. # 36-2 at 5). However, he was unable to provide any

---

[3] On March 5, 2015, the court conducted a *Daubert* hearing at which Plaintiff's expert, Yates, was present. However, Plaintiff used the opportunity to present argument rather than testimony.

evidence of a court admitting his expert testimony under *Daubert* or Rule 702, or any other standard, on issues similar to those for which his opinion is offered in this case.   (Doc. # 52).[4]

On October 28, 2013, Plaintiff provided Yates' Rule 26(a)(2)(B) expert report.   (Doc. # 30-1). Yates was deposed on January 8, 2014.   (Doc. # 30-2).   The deadline for all discovery in this case ran on May 16, 2014, and on June 30, 2014, Defendant filed its Motion to Exclude and Motion for Summary Judgment.   (Docs. # 29-31).   On August 4, 2014, in response to Defendants' Motions, Plaintiff filed his opposition and evidentiary material, which included a supplemental Affidavit of Yates, dated August 4, 2014.   (Doc. # 36-2).   On August 25, 2014, Defendant moved to strike the supplemental Yates Affidavit.   (Doc. # 45).

Yates's initial expert report provides two relevant opinions:

•      The design of Mr. Vickery's rifle is safe and there is nothing about the rifle that caused or contributed to Mr. Vickery's injury.

…

•      Examination of the evidence reveals ample support for the conclusion that the catastrophic failure of the rifle and injury to the shooter was caused by failure of a Remington-Peters, .270 caliber cartridge ignited in the chamber. The resulting over-pressure of the cartridge caused the rifle and cartridge to be blown apart."

(Doc. # 30-1 at 2).

Yates states that in forming his opinions, he:

•      examined, inspected and photographed Mr. Vickery's damaged rifle and his remaining Remington ammunition.

…

•      purchased and inspected and [sic] exemplar rifle which is the Browning A-Bolt .270 caliber and is, in most respects, very similar to Mr. Vickery's rifle.   I

---

[4] The Order from the Circuit Court of Cullman County (Doc. # 52-11) provided as evidence that a court had qualified Yates as an expert is completely silent on the issue for which it was presented.

have dry fired the exemplar rifle, chambered Remington ammunition in the exemplar rifle, and have placed the bolt from the exemplar rifle in Mr. Vickery's rifle.

…

•     observed an inspection performed by Kris Carson, P.E., and received and reviewed the materials from that inspection that were provided to Mr. Vickery's counsel.

…

•     attended an inspection at the Northstar facility in Rochester, Minnesota, where various imaging, scanning, and evaluations of the rifle, its remnants, and the remaining ammunition occurred [and] reviewed the materials from that inspection that were provided to Mr. Vickery's counsel.

(Doc. # 30-1 at 1-2).

Yates has indicated that his opinions are based on his "review of the above-described materials, plus my background, education, training, and experience."   (Docs. # 30-1, 36-2). However, neither his report, nor his affidavit, specifies the methodology or techniques he used to reach his opinions.   (Docs. # 30-1, 36-2).   In his deposition, Yates testified that he had done no testing to verify his hypotheses as to how the accident happened.   (Doc. # 30-2 at 125:19-126:23). He testified that "the physical evidence … speaks for itself."   (Doc. #126:15-127:7).   His opinions are based "on what [he] see[s], what [he] observed, the information that [he] ha[s], and the training, education, and experience and background that [he] ha[s]."   (Doc. # 30-2 at 287:1-288:12).   He admits that he has "no idea" what the pressure was in the cartridge that Plaintiff fired, and that he has not attempted to make that calculation and does not "know how." (Doc. # 30-2 at 131:19-132:12, 216:2-218:2).   Yates's opinions rest on assumptions he has not tested.   (Doc. # 30-2 at 151:6-152:12, 159:11-23, 170:17-172:6, 173:1-174:6, 179:12-180:16, 287:1-288:6, 289:22-290:20, 297:22-299:15).

16

Although Yates reached the opinion that the subject shell was over-pressurized and that may have had "something to do with the propellant that's used," he has made no effort to determine what type of propellant was used.   (Doc. # 213:12-215:10).   That is, he opines that the cartridge was over-pressurized, but has no opinion as to the cause of the over-pressurization.

Yates's Affidavit adds that he "examine[d] and compare[d] the incident rifle and ammunition with [an] exemplar rifle and ammunition" and participate[d] in the testing of the incident rifle and ammunition which was conducted through x-ray scanning."   (Doc. # 36-2). Neither the affidavit, nor the deposition, provide any further insight into Yates's methodology.

The court now turns to the application of the four *Daubert* factors to Yates's report, affidavit, and testimony.   The first *Daubert* factor is "whether the expert's methodology has been tested or is capable of being tested."   Yates admits that he conducted no testing of his theories. There is no evidence in the record that Yates's methodology has been tested or is even capable of being tested.   Frankly, this is not a case where an expert has merely failed to test his methodology. Yates has utterly failed to even articulate a methodology.[5]

---

[5] In *Fortier v. Olin Corporation*, 840 F.2d. 98 (1st Cir. 1988), hunters sued a rifle manufacturer regarding a hunting accident where hunters were injured when another hunter stumbled and fell, resulting in the discharge of his rifle.   In *Fortier*, the plaintiffs presented the testimony of three experts regarding the cause of the accident.   840 F.2d at 102.   The first expert *conducted experiments* to determine how the accident happened.   He determined that,

> the bolt and locking bolt were not fully locked in position behind the cartridge case when the rifle
> fired. If the bolt and locking bolt had been fully locked, all of the energy of the expanding gas from
> the fast-burning gunpowder would have been expended in driving the bullet out of the forward end
> of the cartridge case because the cartridge case would have been fully encased in the chamber and
> could not move backwards. But with the bolt not locked and driven backwards, the cartridge case
> would be free to expand and rupture due to the pressure of the expanding gas within it.

840 F.2d at 102.   He determined this by conducting *experiments* on similar rifles. *Id.*

The second expert, who worked for a gun testing laboratory, also conducted *tests on exemplar rifles*.   He testified that his testing revealed that,

The second *Daubert* factor is "whether the theory or technique used by the expert has been subjected to peer review and publication."   There is no evidence in the record that the theory or technique used by Yates has been subjected to peer review and publication.

The third *Daubert* factor is "whether there is a known or potential error rate of the methodology." There is simply no way to determine the error rate of Yates's methodology because, again, he has never clearly articulated any methodology.   The court does note that, remarkably, one of Yates's untested assumptions was actually disproved during his deposition. (Doc. # 345:16-349:4).   Early in his deposition testimony, Yates testified that if the locking lugs were not rotated into place the gun would not fire.   (Doc. # 30-2 at 104:18-108:13).   ("[T]here certainly would be a problem if they weren't locked down. … It's not going to fire. … You cannot fire it any other way.").   Later in the deposition, however, Yates's assumption in this regard was demonstrated to be incorrect.   Using an exemplar Browning rifle, counsel demonstrated that, when the bolt handle and the locking lugs were disconnected, it was possible to rotate the bolt handle into a fully locked position, yet not engage the locking lugs, and still fire the gun.   (Doc. # 345:16-349:4).   Thus, contrary to Yates's untested assumption, the gun could be fired where the

---

the rifle discharged because "some impact caused the firing pin to move forward and to fire the primer, and at that time the bolt was closed, fully closed but unlocked."   … His explanation for the ruptured cartridge was the same as Vashaw's: the internal pressure of the gas given off by the powder burning inside the cartridge case "blew the base end of the cartridge off and blew the bolt of the rifle open." Martin eliminated the condition of the ammunition as a factor in the discharge, other than that it was present and fired.

840 F.2d at 103.

The third expert, whose regular duties included testing, firing and repairing weapons, also *conducted tests*. 840 F.2d at 104.   "Based on the *tests he conducted*, "he determined that, upon firing, the "locking bolt had not fully locked the bolt into position and, as a result, the bolt blew backwards … ."   *Id.* (emphasis added).

The court does not reference the *Fortier* decision because of the substance of the experts' opinions proffered therein (although those are, at least, interesting). Rather, *Fortier* is cited to emphasize the importance of testing in relation to the *Daubert* analysis that must be undertaken with respect to an expert's assumptions and opinions.

bolt handle is down but the locking lugs have not rotated into position.   (Doc. # 348:17-349:4).

Therefore, in the one instance in the record where Yates's *ipse dixit* assumption was tested, his

assumption proved to be inaccurate.   (Doc. # 345:16-349:4).   *See also Fortier*, 840 F.2d at

102-04.

Finally, the fourth factor is "whether the technique has been generally accepted in the

relevant scientific community."   Again, no technique or methodology has been specified;

therefore, the court is unable to say that Yates's technique has been generally accepted in the

relevant scientific community.   Certainly, no evidence has been presented to suggest that is the

case.

Yates's deposition testimony reveals that he based his opinions on untested assumptions

regarding the operation of the Browning A-bolt rifle.   Yates testified that he had performed no

testing of his hypotheses, and in some instances admitted he would not know how to test them.

(Doc. # 30-2 at 151:6-152:12, 159:11-23, 170:17-172:6, 173:1-174:6, 179:12-180:16,

287:1-288:6, 289:22-290:20, 297:22-299:15).

Yates's opinions assume that the initial causal factor was an over-pressurized shell, and

neglect to account for other possible causes of the gun's failure.   "[A]n expert must provide some

explanation of why other potential causes were not the sole cause."   *Guinn v. AstraZeneca Pharm.*

*LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257,

265 (4th Cir. 1999)).   "'Mere assertions of belief, without any supporting research, testing, or

experiments, cannot qualify as proper expert scientific testimony.'"   *Borum v. Werner Co.,* 2012

WL 2047678, * 13 (N.D. Ala. 2012) (quoting *Slay v. Keller Indus., Inc*., 823 So.2d 623 (Ala. 2001)

(analyzing the expert's admissibility under both *Daubert* and *Frye v. United States*, 293 F. 1013,

1014 (D.C. Cir. 1923)).  "An expert who conducts no testing must be prepared with a good explanation as to why his or her conclusion remained reliable notwithstanding the absence of testing." *Borum,* 2012 WL 2047678 T * 14 (internal quotations omitted) (quoting *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 588–89 (N.D. Fla. 2009) (in turn quoting *Bauer v. Bayer A. G.*, 564 F.Supp.2d 365, 379 (M.D. Pa. 2008) (in turn quoting *In Re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir.1994)))).   Yates has provided no such explanation.

As discussed above, an expert's failure to satisfy any of the four *Daubert* factors is sufficient to exclude the expert's testimony.   *Daubert*, 509 U.S. at 593–94.   Because the evidence does not support the conclusion that Yates satisfies any of the *Daubert* factors, his testimony is due to be excluded.[6]   Because the exclusion of his expert testimony leaves Plaintiff without evidence of causation, Defendant's Motion for Summary Judgment is also due to be granted.   *McCreless v. Global Upholstery Co., Inc.,* 500 F.Supp.2d 1350, 1358 (N.D. Ala. 2007) (granting summary judgment where defective design or manufacture and proximate cause were essential elements of all theories being pursued by Plaintiff, and because of the exclusion of his expert, Plaintiff had no evidence to support these essential elements).

Finally, Defendant has presented expert testimony in support of its Motion for Summary Judgment.   (Docs. # 30-3–30-5).   That testimony shows that the cause of the Plaintiff's incident was the rifle, not the ammunition. (Docs. # 30-3–30-5).   Although Plaintiff disagrees with those experts' testimony, the exclusion of his own expert leaves Plaintiff with no factual support, at all, in the Rule 56 record to dispute it.   That is, with the exclusion of Yates's expert testimony, there is

---

[6] Yates's Affidavit is also due to be stricken as an untimely and improper supplemental expert report. *Borum,* 2012 WL 2047678 at * 11 (excluding expert's affidavit filed after the close of discovery, and after defendant had moved for summary judgment and also moved to strike the expert's testimony).

no genuine issue of material fact for a jury to resolve as to the cause the subject incident.   For this

reason also, Defendant is entitled to summary judgment.

A separate order will be entered.

**DONE** and **ORDERED** this March 19, 2015.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE